(December 17, 2015)

■ KELLY FORMAN, Appellant, v MARK HENKIN, Respondent. [22 NYS3d 178]—

Order, Supreme Court, New York County (Lucy Billings, J.), entered March 19, 2014, which, to the extent appealed from as limited by the briefs, granted defendant's motion to compel to the extent of directing plaintiff to produce all photographs of plaintiff privately posted on Facebook prior to the accident at issue that she intends to introduce at trial, all photographs of plaintiff privately posted on Facebook after the accident that do not show nudity or romantic encounters, and authorizations for defendant to obtain records from Facebook showing each time plaintiff posted a private message after the accident and the number of characters or words in those messages, modified, on the law and the facts, to vacate those portions of the order directing plaintiff to produce photographs of herself posted to Facebook after the accident that she does not intend to introduce at trial, and authorizations related to plaintiff's private Facebook messages, and otherwise affirmed, without costs.

In this personal injury action, plaintiff alleges that while riding one of defendant's horses, the stirrup leather attached to the saddle broke, causing her to lose her balance and fall to the ground. Plaintiff claims that defendant was negligent because, inter alia, he failed to properly prepare the horse for riding, and neglected to maintain and inspect the equipment. Plaintiff alleges that the accident resulted in cognitive and physical injuries that have limited her ability to participate in social and recreational activities. At her deposition, plaintiff testified that she maintained and posted to a Facebook account prior to the accident, but deactivated the account at some point after.

Defendant sought an order compelling plaintiff to provide an unlimited authorization to obtain records from her Facebook account, including all photographs, status updates and instant messages. The motion court granted the motion to the extent of directing plaintiff to produce: (a) all photographs of herself privately posted on Facebook prior to the accident that she

intends to introduce at trial; (b) all photographs of herself privately posted on Facebook after the accident that do not show nudity or romantic encounters; and (c) authorizations for Facebook records showing each time plaintiff posted a private message after the accident and the number of characters or words in those messages. Plaintiff now appeals.

CPLR 3101 (a) provides that "[t]here shall be full disclosure of all matter material and necessary in the prosecution or defense of an action." In determining whether the information sought is subject to discovery, "[t]he test is one of usefulness and reason" (*Allen v Crowell-Collier Publ. Co.*, 21 NY2d 403, 406 [1968]). " 'It is incumbent on the party seeking disclosure to demonstrate that the method of discovery sought will result in the disclosure of relevant evidence or is reasonably calculated to lead to the discovery of information bearing on the claims' " (*Vyas v Campbell*, 4 AD3d 417, 418 [2d Dept 2004], quoting *Crazytown Furniture v Brooklyn Union Gas Co.*, 150 AD2d 420, 421 [2d Dept 1989]; *see also GS Plasticos Limitada v Bureau Veritas Consumer Prods. Servs., Inc.*, 112 AD3d 539, 540 [1st Dept 2013] [sufficient factual predicate required for discovery demands]; *Sexter v Kimmelman, Sexter, Warmflash & Leitner*, 277 AD2d 186 [1st Dept 2000]). Discovery demands are improper if they are based upon " 'hypothetical speculations calculated to justify a fishing expedition' " (*Budano v Gurdon*, 97 AD3d 497, 499 [1st Dept 2012], quoting *Manley v New York City Hous. Auth.*, 190 AD2d 600, 601 [1st Dept 1993]).

This Court has consistently applied these settled principles in the context of discovery requests seeking a party's social media information. For example, in *Tapp v New York State Urban Dev. Corp.* (102 AD3d 620 [1st Dept 2013]), we denied the defendants' request for an authorization for the plaintiff's Facebook records, concluding that the mere fact that the plaintiff used Facebook was an insufficient basis to provide the defendant with access to the account. Likewise, in *Pecile v Titan Capital Group, LLC* (113 AD3d 526 [1st Dept 2014]), we concluded that vague and generalized assertions that information in the plaintiff's social media sites might contradict the plaintiff's claims of emotional distress were not a proper basis for disclosure (*see also Abrams v Pecile*, 83 AD3d 527 [1st Dept 2011] [rejecting the defendant's demand for access to the plaintiff's social networking sites because there was no showing that information in those accounts would lead to relevant evidence bearing on the plaintiff's claims]).

Other Departments of the Appellate Division, consistent with well-established case law governing disclosure, have required

some threshold showing before allowing access to a party's private social media information (*see e.g. Richards v Hertz Corp.*, 100 AD3d 728, 730-731 [2d Dept 2012] [striking demand for Facebook information of one of the plaintiffs because there was no showing that the disclosure of that material would result in disclosure of relevant evidence or would be reasonably calculated to lead to discovery of information bearing on the claim]; *McCann v Harleysville Ins. Co. of N.Y.*, 78 AD3d 1524, 1525 [4th Dept 2010] [denying authorization for the plaintiff's Facebook information where the defendant failed to establish a factual predicate of relevancy, and characterizing the request as "a fishing expedition . . . based on the mere hope of finding relevant evidence" (internal quotation marks omitted)]). Guided by these principles, we conclude that defendant has failed to establish entitlement to either plaintiff's private Facebook photographs, or information about the times and length of plaintiff's private Facebook messages. The fact that plaintiff had previously used Facebook to post pictures of herself or to send messages is insufficient to warrant discovery of this information (*see Tapp*, 102 AD3d at 620 [the plaintiff's mere utilization of a Facebook account is not enough]). Likewise, defendant's speculation that the requested information might be relevant to rebut plaintiff's claims of injury or disability is not a proper basis for requiring access to plaintiff's Facebook account (*see id.* at 621 [the defendants' argument that the plaintiff's Facebook postings might reveal daily activities that contradict claims of disability is "nothing more than a request for permission to conduct a fishing expedition" (quotation marks omitted)]; *Pecile*, 113 AD3d at 527 [vague and generalized assertions that the information sought might conflict with the plaintiff's claims of emotional distress insufficient]).*

However, in accordance with standard pretrial procedures, plaintiff must provide defendant with all photographs of herself posted on Facebook, either before or after the accident, that she intends to use at trial. Plaintiff concedes that she cannot use these photographs at trial without having first disclosed them to defendant.

We disagree with the dissent's position that we should reconsider the well-settled body of case law, from both this Court and other Departments, governing the disclosure of

---

\* The fact that plaintiff deactivated her Facebook account is not a basis to conclude that relevant information is contained therein. In any event, in the motion papers below, defendant's counsel conceded that he conducted a search of plaintiff's public Facebook profile before she deactivated it and found nothing but an old picture of her.

social media information. Both parties here agree with the general legal principles set forth in the existing case law and differ only as to the application of those principles to the specific facts of this case. Neither party asks us to revisit our controlling precedent, and the doctrine of stare decisis requires us to adhere to our prior decisions (*see People v Aarons*, 305 AD2d 45, 56 [1st Dept 2003] ["stare decisis stands as a check on a court's temptation to overrule recent precedent. Only compelling circumstances should require us to depart from this doctrine"], *affd* 2 NY3d 547 [2004]). Although we agree with the dissent that social media is constantly evolving, there is no reason to alter the existing legal framework simply because the potential exists that new social network practices may surface. Furthermore, there is no dispute that the features of Facebook at issue here (i.e., the ability to post photographs and send messages) have been around for many years.

Contrary to the dissent's view, this Court's prior decisions do not stand for the proposition that different discovery rules exist for social media information. The discovery standard we have applied in the social media context is the same as in all other situations—a party must be able to demonstrate that the information sought is likely to result in the disclosure of relevant information bearing on the claims (*see e.g. GS Plasticos Limitada*, 112 AD3d at 540; *Budano*, 97 AD3d at 499; *Sexter*, 277 AD2d at 187; *Manley*, 190 AD2d at 601). This threshold factual predicate, or "reasoned basis" in the words of the dissent, stands as a check against parties conducting "fishing expeditions" based on mere speculation (*see Devore v Pfizer Inc.*, 58 AD3d 138, 144 [1st Dept 2008], *lv denied* 12 NY3d 703 [2009] [parties cannot use discovery "as a fishing expedition when they cannot set forth a reliable factual basis for what amounts to, at best, mere suspicions"]).

Although we agree with the dissent that the discovery standard is the same regardless of whether the information requested is contained in social media accounts or elsewhere, we disagree with the dissent's analysis as to how that standard should work in the personal injury context. According to the dissent, "[i]f a plaintiff claims to be physically unable to engage in activities due to the defendant's alleged negligence, posted information, including photographs and the various forms of communications (such as status updates and messages) that establish or illustrate the plaintiff's former or current activities or abilities will be discoverable." This view, however, is contrary to our established precedent holding otherwise (*see Pecile v Titan*, 113 AD3d at 526; *Tapp*, 102 AD3d at 620;

*Abrams*, 83 AD3d at 527). We are bound by principles of stare decisis to follow this prior precedent, particularly here where no party asks us to revisit it, and we believe that this precedent results in the correct outcome here.

Taken to its logical conclusion, the dissent's position would allow for discovery of all photographs of a personal injury plaintiff after the accident, whether stored on social media, a cell phone or a camera, or located in a photo album or file cabinet. Likewise, it would require production of all communications about the plaintiff's activities that exist not only on social media, but in diaries, letters, text messages and emails. Allowing the unbridled disclosure of such information, based merely on speculation that some relevant information might be found, is the very type of "fishing expedition" that cannot be countenanced. Contrary to the dissent's view, there is no analogy between the defense litigation tool of surveillance video and the wholesale discovery of private social media information. The surveillance of a personal injury plaintiff in public places is a far cry from trying to uncover a person's private social media postings in the absence of any factual predicate.

The question of whether a court should conduct an in camera review of social media information is not presented on this appeal. The court below did not order an in camera review, nor do the parties on appeal request any such relief. Further, the dissent is mistaken that our prior decisions in this area require a court to conduct an in camera review in all circumstances where a sufficient factual predicate is established. The decision whether to order an in camera review rests in the sound discretion of the trial court, or in this Court's discretion if we choose to exercise it (*see Gottlieb v Northriver Trading Co. LLC*, 106 AD3d 580 [1st Dept 2013]; *Horizon Asset Mgt., Inc. v Duffy*, 82 AD3d 442, 443 [1st Dept 2011]). The cases cited by the dissent in which an in camera review was directed stand simply for the proposition that those courts, in their discretion, believed that such review was appropriate.

Finally, plaintiff's claim that the motion court erred in sua sponte ordering a physical and psychological examination of her is based on a misreading of the court's decision. As defendant acknowledges, the court did not grant such relief, but merely referenced the previously scheduled examination discussed at oral argument. Concur—Moskowitz, Richter and Kapnick, JJ.

Acosta, J.P., and Saxe, J., dissent in a memorandum by Saxe, J., as follows: This appeal, concerning whether defendant is

entitled to disclosure of information that plaintiff posted on the nonpublic portion of her Facebook page before she deactivated her account, prompts me to suggest that we reconsider this Court's recent decisions on the subject (*see e.g. Patterson v Turner Constr. Co.*, 88 AD3d 617 [1st Dept 2011]; *Tapp v New York State Urban Dev. Corp.*, 102 AD3d 620 [1st Dept 2013]; *Spearin v Linmar, L.P.*, 129 AD3d 528 [1st Dept 2015]). There are two aspects of these previous rulings that are problematic: first, the showing necessary to obtain discovery of relevant information posted on Facebook or other social networking sites, and second, the procedure requiring that once a threshold showing is made, the trial court must conduct an in camera review of the posted contents in each case to ensure that the defendant's access is limited to relevant information. In view of how recently our initial rulings on the subject were issued, it makes sense to revisit those initial rulings sooner rather than later; in any event, the topic is too new to warrant rigid adherence at this time to our initial rulings under the doctrine of stare decisis.

Facts

Plaintiff Kelly Forman alleges that she was injured on June 20, 2011 while visiting defendant Mark Henkin in Westhampton. The two were on what was to be a leisurely horseback ride, when plaintiff fell off of the animal, allegedly due to negligence on the part of Henkin and his employees in failing to correctly tack up the saddle and providing faulty equipment. Plaintiff alleges serious and debilitating injuries, including traumatic brain injury and spinal injuries, causing cognitive deficits, memory loss, inability to concentrate, difficulty in communicating, and social isolation, severely restricting her daily life. Approximately five months later, she commenced this action.

In a written statement plaintiff provided to defendant at her deposition, she described the nature of her claimed physical, mental and psychological injuries. Among the assertions she made was that after the accident, her "social network went from huge to nothing." At her deposition, plaintiff testified that before the accident she had maintained a Facebook page and had posted photographs showing her doing fun things, but that she deactivated her Facebook page some months after the accident (and after the commencement of this action), some time between June and August of 2012. She said that due to her current difficulties with memory, she could not recall the exact nature or extent of her Facebook activity from the time of the accident until she deactivated the account.

Defendant demanded an authorization to obtain plaintiff's Facebook records, unlimited in time and scope. When the issue was raised by motion, defendant argued that the requested material was necessary for his defense, as it was relevant to the issue of plaintiff's credibility. Plaintiff opposed the motion, arguing that defendant had not shown that the material requested was reasonably calculated to result in the disclosure of relevant evidence, or was material and necessary to the defense of the claims, but that rather, defendant was only speculating that materials posted in her Facebook account after the accident contained such evidence.

The court directed disclosure of any photographs posted after the accident which do not depict nudity or romantic encounters, along with any photographs posted before the accident that plaintiff intends to use at trial, as well as any private Facebook messages plaintiff sent after the accident, redacted so that the only information provided is the amount of characters and the time at which the message was sent. On plaintiff's appeal, the majority concludes that the direction for the disclosure of photographs and information about private messages must be vacated, in the absence of a factual predicate that contradicts or conflicts with plaintiff's claims. We disagree with that approach to the subject, although it comports with our current case law.

Discussion

A few basic concepts about Facebook must be understood for this discussion (*see generally* Facebook, http://www. facebook.com/help [accessed July 21, 2015]). Every person who subscribes to Facebook has a "public page" containing information that the subscriber allows to be viewed by the general public, which may include content such as photographs, status updates, or shared links. Each subscriber may choose to make each piece of posted content publicly available, or may limit the posted content so that it can only be viewed by a more limited group, such as the individuals identified by the subscriber as "friends," or a customized list of people. Subscribers can also use Facebook to send messages to other subscribers in a manner similar to text messaging. Those messages will not be visible to anyone not involved in them.

If a subscriber opts to deactivate his or her Facebook page, that person's page is no longer viewable. However, deactivating one's Facebook page does not erase the information that was previously posted there. Instead that information remains pres-

ent in Facebook's internal records, so that it can be restored by reactivation of an account, or obtained through a court order.*

Over the past few years, as social networking sites have become increasingly ubiquitous, courts across the country have adopted a variety of approaches to discovery of social media accounts (*see generally* Rick E. Kubler and Holly A. Miller, *Recent Developments in Discovery of Social Media Content*, ABA Section of Litigation, Insurance Coverage Litigation Committee CLE Seminar, available at http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/2015_inscle_materials/written_materials/24_1_recent_developments_in_discovery_of_social_media_content.authcheckdam.pdf [accessed Sept. 28, 2015]). It is clear that "discovery of social networking information is a developing body of jurisprudence" (Mallory Allen & Aaron Orheim, *Get Outta My Face[book]: The Discoverability of Social Networking Data and the Passwords Needed to Access Them*, 8 Wash J L Tech & Arts 137, 152 [2012]).

The case law that has emerged in this state in the last few years regarding discovery of information posted on personal social networking sites holds that a defendant will be permitted to seek discovery of the nonpublic information a plaintiff posted on social media, *if, and only if,* the defendant can first unearth some item from the plaintiff's publicly available social media postings that tends to conflict with or contradict the plaintiff's claims. Even if that hurdle is passed, then the trial court must conduct an in camera review of the materials posted by the plaintiff to ensure that the defendant is provided only with relevant materials.

The first New York State appellate case considering a demand for the contents of a plaintiff's Facebook account was issued by the Fourth Department in 2010, affirming the denial of the defendant's motion for such an authorization (*McCann v Harleysville Ins. Co. of N.Y.*, 78 AD3d 1524 [4th Dept 2010]). In rejecting the defendant's assertion that the information was relevant to whether the plaintiff had sustained a serious injury in the accident, the Fourth Department observed that the demand was essentially "a fishing expedition" into the plaintiff's Facebook account in the hope of finding relevant evidence (*id.* at 1525). It is worth noting that the demand in

---

* It is also possible for an account to be permanently deleted, an option not relevant to this discussion, but which could, in certain circumstances, lead to a spoliation claim (*see Gatto v United Air Lines, Inc.*, 2013 WL 1285285, 2013 US Dist LEXIS 41909 [D NJ, Mar. 25, 2013, Civil Action No. 10-cv-1090-ES-SCM]).

*McCann* was for the entire contents of the plaintiff's Facebook account; the defendant made no effort to tailor the demand to limit it to relevant, discoverable materials contained there.

The Fourth Department elaborated on the point in *Kregg v Maldonado* (98 AD3d 1289 [4th Dept 2012]). In *Kregg,* upon learning that family members of the injured party had established Facebook and MySpace accounts for him and had posted material on his behalf in connection with those accounts, the defendants requested the disclosure of the contents of those and any other social media accounts maintained by or on behalf of the injured party. The Court explained that the request was made without "a factual predicate with respect to the relevancy of the evidence" (*id.* at 1290, quoting *McCann* at 1525; *Crazytown Furniture v Brooklyn Union Gas Co.,* 150 AD2d 420, 421 [2d Dept 1989]), observing that "there [was] no contention that the information in the social media accounts contradict[ed] plaintiff's claims for the diminution of the injured party's enjoyment of life" (*Kregg* at 1290). The prerequisite of a "factual predicate" contradicting the plaintiff's claims, imposed in *McCann* and *Kregg,* has been incorporated into the decisions that followed on discovery of material posted on social media.

In *Tapp v New York State Urban Dev. Corp.* (102 AD3d 620 [1st Dept 2013]), this Court concluded that merely having a Facebook account does not establish a factual predicate for discovery of private material posted to a Facebook page. *Tapp* used the *Kregg* concept of requiring a "factual predicate" before allowing a defendant to obtain discovery of information the plaintiff posted on social media: "defendants must establish a factual predicate for their request by identifying relevant information in plaintiff's Facebook account—that is, information that 'contradicts or conflicts with plaintiff's alleged restrictions, disabilities, and losses, and other claims' " (*id.* at 620-621, quoting *Patterson v Turner Constr. Co.,* 88 AD3d 617, 618 [1st Dept 2011]; *Kregg,* 98 AD3d at 1290). Indeed, in *Tapp,* this Court explicitly rejected the defendant's rationale that "plaintiff's Facebook postings 'may reveal daily activities that contradict or conflict with' plaintiff's claim of disability," asserting that the argument amounted to a "fishing expedition" (*id.* at 621, citing *McCann* at 1525).

Even where some factual predicate for the disclosure of information posted on social media is established, this Court has required that an in camera review be performed so that the defendant is not made privy to non-relevant content. This procedure was imposed in *Patterson v Turner Constr.* and the recent case of *Spearin v Linmar, L.P.* (129 AD3d 528 [1st Dept

2015]). In *Patterson*, where the defendant requested an authorization for all of the plaintiff's Facebook records after the incident, the motion court conducted an in camera review and determined that at least some of the information contained there would "result in the disclosure of relevant evidence" or was "reasonably calculated to lead to the discovery of information bearing on the claims," and consequently ordered the plaintiff to provide the requested authorization. (*Patterson* at 618.) This Court remanded the matter back to the motion court for a more specific determination, explaining that "it is possible that not all Facebook communications are related to the events that gave rise to plaintiff's cause of action" (*id.*).

In *Spearin*, the plaintiff's public profile picture from his Facebook account, uploaded after his accident, depicted the plaintiff sitting in front of a piano, which tended to contradict his testimony that, as a result of the claimed accident he could longer play the piano (*id.* at 528). Even so, this Court modified an order that required the plaintiff to provide an authorization for access to his Facebook account; we required, instead, an in camera review of the plaintiff's post-accident Facebook postings for identification of information relevant to the plaintiff's alleged injuries (*id.*). The Second Department ruled similarly in *Richards v Hertz Corp.* (100 AD3d 728, 730 [2d Dept 2012]), where the plaintiff claimed she could no longer ski, yet after the accident a picture was uploaded depicting her on skis. This factual predicate was held to entitle the defendant *not* to an authorization for all of the material posted to Facebook by the plaintiff, but to an in camera review of those items and a determination of which ones were relevant to the claims (*id.*).

The procedure created by these cases, by which a defendant may obtain discovery of nonpublic information posted on a social media source in a plaintiff's control only if that defendant has first found an item tending to contradict the plaintiff's claims, at which time the trial court must conduct an in camera review of all the items contained in that social media source, imposes a substantial—and unnecessary—burden on trial courts. As one Suffolk County justice has observed, "in camera inspection in disclosure matters is the exception rather than the rule, and there is no basis to believe that plaintiffs' counsel can not honestly and accurately perform the review function" (*Melissa G v North Babylon Union Free Sch. Dist.*, 48 Misc 3d 389, 393 [Sup Ct, Suffolk County 2015]).

Moreover, as the numbers of people who maintain social networking site accounts increase over time, there will be a commensurate increase in the burden on the trial courts

handling personal injury litigation to conduct in camera reviews of litigants' social media postings. Our trial courts are already overburdened; we should think twice about unnecessarily adding to their workload.

Moreover, the extra burden is clearly unnecessary since the procedure we are currently employing stands in marked contrast to the standard discovery procedure in civil litigation generally.

All discovery issues in this state are controlled by CPLR 3101 (a), which provides that "[t]here shall be full disclosure of all matter material and necessary in the prosecution or defense of an action." The term "material and necessary" has long been interpreted liberally in New York, "to require disclosure, upon request, of any facts bearing on the controversy which will assist preparation for trial" (*Allen v Crowell-Collier Publ. Co.*, 21 NY2d 403, 406 [1968]; *Anonymous v High School for Envtl. Studies*, 32 AD3d 353 [1st Dept 2006]). As the Court of Appeals has more recently put it, "New York has long favored open and far-reaching pretrial discovery" (*DiMichel v South Buffalo Ry. Co.*, 80 NY2d 184, 193 [1992], *cert denied sub nom. Poole v Consolidated Rail Corp.*, 510 US 816 [1993]).

It is true that the law does not allow "fishing expeditions," that is, the use of a disclosure demand based solely on "hypothetical speculations" (*Manley v New York City Hous. Auth.*, 190 AD2d 600, 601 [1st Dept 1993] [internal quotation marks omitted]), "merely to see what beneficial things might be inadvertently discovered from the other side" (*see* Patrick M. Connors, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3101:8). However, that does not mean that there is a preliminary requirement that the party seeking discovery must be able to prove that the other side has in its possession an item or items answering to the description in the discovery demand. Rather, the "material and necessary" standard only requires a reasoned basis for asserting that the requested category of items "bear[s] on the controversy" (*see id.*), or a showing that it is likely to produce relevant evidence (Anne M. Payne & Arlene Zalayet, Modern New York Discovery § 22.55.60 at 245 [2d ed 2004, 2015 Suppl]).

Of course, the statute creates exceptions for privileged matter, attorney's work product, and materials prepared in anticipation of litigation (*see* CPLR 3101 [b], [c], [d] [2]); but, beyond such statutory protections, "if nothing unusual can be shown to invoke the court's protective order powers under CPLR 3103 (a), as with a showing that the disclosure devices are being used for harassment or delay, the party is entitled to

the disclosure" (Connors, Practice Commentaries at CPLR C3101:8). Finally, a demand may not be overbroad; it must seek only materials relevant to the issues raised in the litigation, and if it fails to distinguish between relevant and irrevelant items, a protective order pursuant to CPLR 3103 (a) may be issued.

In accordance with the foregoing, generally, in a personal injury action, a defendant may serve on a plaintiff a notice to produce tangible documents or other items in the plaintiff's possession or control, describing the type of content that is relevant to the claimed event and injuries. Assuming that the demand is sufficiently tailored to the issues, and unless a claim of privilege is made, normally the plaintiff must then search through those items to locate any items that meet the demand, and provide those items. There is not usually a need for the trial court to sift through the contents of the plaintiff's filing cabinets to determine which documents are relevant to the issues raised in the litigation.

One federal magistrate judge provided a cogent analysis of why the rule our courts have adopted regarding discovery from social media accounts should be changed, and a traditional approach used instead: "Some courts have held that the private section of a Facebook account is only discoverable if the party seeking the information can make a threshold evidentiary showing that the plaintiff's public Facebook profile contains information that undermines the plaintiff's claims. This approach can lead to results that are both too broad and too narrow. On the one hand, a plaintiff should not be required to turn over the private section of his or her Facebook profile (which may or may not contain relevant information) merely because the public section undermines the plaintiff's claims. *On the other hand, a plaintiff should be required to review the private section and produce any relevant information, regardless of what is reflected in the public section.* The Federal Rules of Civil Procedure do not require a party to prove the existence of relevant material before requesting it. Furthermore, this approach improperly shields from discovery the information of Facebook users who do not share any information publicly. For all of the foregoing reasons, the Court will conduct a traditional relevance analysis" (*Giacchetto v Patchogue-Medford Union Free Sch. Dist.*, 293 FRD 112, 114 n 1 [ED NY 2013] [emphasis added and citations omitted]).

There is no reason why the traditional discovery process cannot be used equally well where a defendant wants disclosure of information in digital form and under the plaintiff's control,

posted on a social networking site. The demand, like any valid discovery demand, would have to be limited to reasonably defined categories of items that are relevant to the issues raised. Upon receipt of an appropriately tailored demand, a plaintiff's obligation would be no different than if the demand concerned hard copies of documents in filing cabinets. A search would be conducted through those documents for responsive relevant documents, and, barring legitimate privilege issues, such responsive relevant documents would be turned over; and if they could not be accessed, an authorization for them would be provided.

There is no particular difficulty in applying our traditional approach to discovery requests for information posted on social networking sites. If a plaintiff claims to be physically unable to engage in activities due to the defendant's alleged negligence, posted information, including photographs and the various forms of communications (such as status updates and messages) that establish or illustrate the plaintiff's former or current activities or abilities will be discoverable. If a plaintiff's claims are for emotional or psychological injury, it may be more difficult to frame a discovery demand, but it can certainly be done without resorting to a blanket demand for everything posted to the account (*see e.g. Giacchetto*, 293 FRD at 112; *Equal Empl. Opportunity Commn. v Simply Storage Mgt., LLC*, 270 FRD 430 [SD Ind 2010]).

Using the approach I suggest would also obviate the need for the awkward and questionable procedure adopted by the motion court in this matter with regard to posted messages; the order on appeal allowed defendant access to only the number of characters per message and the time each was sent on plaintiff's Facebook page, but not the content. If the traditional approach to discovery were applied to posted messages, they could be treated exactly as any other letter, notice or document.

Of course, categorizing posted material as "private" does not constitute a legitimate basis for protecting it from discovery. There can be no reasonable expectation of privacy in communications that have reached their intended recipients (*see United States v Lifshitz*, 369 F3d 173, 190 [2d Cir 2004]; *see generally Romano v Steelcase Inc.*, 30 Misc 3d 426, 432-434 [Sup Ct, Suffolk County 2010]). As long as the item is relevant and responsive to an appropriate discovery demand, it is discoverable. To the extent disclosure of contents of a social media account could reveal embarrassing information, "that . . . is the inevitable result of alleging these sorts of injuries"

(*Equal Empl. Opportunity Commn. v Simply Storage*, 270 FRD at 437).

Nor should it matter that the account was "deactivated," since apparently a deactivated account may easily be "reactivated," thereby giving the subscriber access to the previously posted material (*see generally* Facebook, http://www.facebook.com/help [accessed July 21, 2015]). An authorization for the site itself to provide posted content would be necessary only if previously posted materials became inaccessible to the subscriber.

The majority suggests that the doctrine of stare decisis precludes us from altering our previous rulings. However, in my view this so-called "well-settled body of case law" is not so long-established that it is deserving of immutable stare decisis treatment. "[T]he relevant factors in deciding whether to adhere to the principle of stare decisis include the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned" (*Montejo v Louisiana*, 556 US 778, 792-793 [2009]). Not only are the precedents under consideration here only a few years old, but they concern social networking practices that are still in the process of developing. Under these circumstances, the relationship of social media and the law ought to be flexible, open to discussion and re-examination, rather than bound by our initial views regarding the optimal procedure to be used.

In addition to relying on stare decisis, the majority concludes that there is no need to "alter the existing legal framework." Little is said about how the existing decisions have unfairly created a rule of judicial protectionism for the digital messages and images created by social networking site users, in contrast to how discovery of tangible documents is treated under the CPLR.

In this context—the area where litigation and social media converge—it is important to keep in mind that in recent years social media profiles have become virtual windows into subscribers' lives. The breadth of information posted by many people on a daily basis creates ongoing portrayals of those individuals' lives that are sometimes so detailed that they can rival the defense litigation tool referred to as a "day in the life" surveillance video. And, just as "day in the life" videos are a staple of tort practice (*see* Ken Strutin, *The Use of Social Media in Sentencing Advocacy; Technology Today*, NYLJ, Sept. 28, 2010 at 5, col 1), the contents of a self-made portrait of a plaintiff's day-to-day life may contain information appropriate for discovery in personal injury litigation.

Facebook and other similar social networking sites are so popular that it will soon be uncommon to find a personal injury plaintiff who does not maintain such an on-line presence. We should keep that in mind when unnecessarily creating new discovery procedures for them, especially when those procedures are unduly burdensome on our trial courts. ■